1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,          CASE NO. 3:15-cr-2044-GPC

11                          Plaintiff,  **AMENDED ORDER DENYING
                                       DEFENDANT'S MOTIONS TO**
12      vs.                            **SUPPRESS EVIDENCE AND
                                       DISMISS INDICTMENT**
13
14  JAVIER MARIN-CAMPOS,               **[ECF No. 51.]**

15                          Defendant.

16  ────────────────────────────────

17                         **INTRODUCTION**

18        On July 7, 2015, Defendant Javier Marin-Campos ("Marin" or "Defendant") was

19  arrested at the San Clemente Border Patrol Checkpoint (the "Checkpoint") following

20  a canine alert on his Lincoln Navigator at the secondary inspection area and the

21  discovery of water bottles containing approximately liquid methamphetamine in the back

22  seat of the vehicle. Defendant is charged in a one-count indictment with possession of

23  methamphetamine with intent to distribute. On July 13, 2016, Defendant filed a motion

24  to dismiss indictment and motions to suppress evidence challenging the use of the

25  checkpoint, a prolonged detention, the canine sniff, the search of his vehicle, and the

26  destruction of evidence. Hearings on the motion were conducted on August 5, 10, 18,

27  and September 2, 23 and 28, 2016. Based on the papers filed, testimony of the witnesses

28  called, and the exhibits admitted, the Court **DENIES** the motions to suppress evidence

1   and motion to dismiss indictment. [1]

2                           **FACTUAL BACKGROUND**

3           Border Patrol radio call transcripts show that on July 7, 2015 at approximately

4   4:45 p.m., Border Patrol agents began preparations for the operation of the primary and

5   secondary inspection areas of the Checkpoint (identified in the radio call transcripts by

6   the number "822"). (Defendant's Ex. A at 2, ECF 52-1 at 3.) The schedule for the

7   operation of the Checkpoint was predetermined in advance and approved by Watch

8   Commander Berosovy. (ECF 67.) The schedule reflects that the Checkpoint was to be

9   operational on July 7th between the hours of 5:45 p.m. and 6:15 p.m. (Government's Ex.

10  100.) By 5:51 p.m., arrangements were completed by the Border Patrol, and the

11  Checkpoint was fully operational and visible with lights and signs. (ECF 52-1 at 3.)

12          At approximately 6:10:36 p.m. (the time is presented by hour: minute: second as

13  recorded on video recordings), Border Patrol Agent Pagan was the "point" agent

14  standing between two lanes of traffic and screening all northbound traffic at the primary

15  checkpoint. (RT 8/5/16 at 7.) Agent Pagan testified that he had no role in the decision

16  to open the Checkpoint, had not received any instruction to refer any particular vehicle

17  to secondary, and had not received information regarding Marin or the Navigator. (*Id.*

18  at 12, 34.)

19          At this time, Marin approached Agent Pagan's position holding a B1/B2 visa card.

20   (*Id.* at 7.) Marin was the driver and sole occupant of a black Lincoln Navigator with

21  California license plates. Agent Pagan, who noted that the vehicle had California plates,

22  proceeded to conduct routine questioning and asked Marin of his citizenship, where he

23  was going, the purpose of his travel, and when he had crossed. Marin responded that he

24  was a Mexican national with a B1/B2 visa card, had just entered the United States by

25  walking through the Otay Mesa Port of Entry, and had picked up the Navigator north of

26  the border. (Arnotti Report, ECF 56 at 29; RT 8/5/16 at 7-9.) Marin was described as

27  _____

28          [1] The Amended Order makes corrections at page 1, line 3 and page 13, lines 3-6
    and is otherwise unchanged.

calm at this point. Agent Pagan testified that he did not take the B1/B2 card for review at primary in order to accommodate other traffic. (*Id*. at 11.) A video of the primary checkpoint shows that traffic was heavy at this time. (Govt. Ex. 1.) Based upon Marin's answers, at approximately 6:11:33 p.m., Marin radioed secondary to advise that the vehicle was being referred to secondary inspection and noted that the driver of the vehicle had crossed on foot. (ECF 52-1 at 3.)

At approximately 6:11:51 p.m. in the secondary inspection area, Agent Gomez made contact with Marin and questioned him about his immigration status, his destination, and the ownership of the Navigator. (RT 8/5/16 at 53, 66; ECF 52-1, Ex. D.) Marin handed Agent Gomez an I-94 card and a B1/B2 visa, which allows Marin to travel 25 miles beyond the border but does not permit him to reside or work in the United States. (RT 8/5/16 at 54, 108, 110.) Marin stated that he had borrowed the vehicle from a friend and that the vehicle belonged to his friend. (*Id*. at 53.) Marin stated that he was on his way to Anaheim to purchase a vehicle; although he did not know where in Anaheim he would do so, he was to call someone for further instructions upon arriving in Anaheim. (*Id*.) During this questioning, three other officers at secondary were standing on the passenger side of the Navigator in uniform and carrying sidearms which were not brandished. (*Id.* at 89; ECF 52-1, Ex. D.)

Agent Gomez then asked Marin, "Do you have any property that belongs to you in the vehicle?" Marin answered ,"Nothing belongs to me, and I don't know what is in the vehicle." (RT 8/5/16 at 54.) Agent Gomez noticed a "sudden change" in Marin's reaction and that Marin became nervous after the question. (RT 8/15/16 at 107.) Agent Gomez then asked if "we could run a canine inside and out of the car." Defendant replied, "Yes." (RT 8/5/16 at 55.) At this time, Agent Gomez was dressed in a Border Patrol uniform but was not brandishing a weapon. Defendant was not handcuffed. Agent Gomez asked Marin to step out of the car, open the trunk and take a seat on the bench. (RT 8/5/16 at 55.) Video at the secondary inspection area shows Marin exiting the vehicle at 6:13 p.m.

After exiting the vehicle and consenting to the canine sniff, Canine Enforcement Officer Fernandez asked Marin again if he could conduct a canine sniff, and Marin replied "go ahead." (ECF 52-1 at 24, Ex. H.)  Agent Gomez testified that he overheard CEO Fernandez ask Marin for consent to run the canine on the Navigator.  (RT 8/5/16 at 57, 62.)  Marin then consented to the canine sniff a second time.  (*Id*. at 57, 59.) Agent Fernandez also asked Marin for his documents and noticed that Marin's hand was shaking.

While follow-up investigation was taking place at secondary, record checks were being conducted on Marin and the Navigator.  At 6:16 p.m., the checks revealed that the registered owner of the Navigator was Jose Martinez-Jimenez, and that the car had entered the United States though the Otay Mesa Port of Entry earlier that day at 4:38 p.m.  (*Id*. at 60-62.)

At approximately 6:20 p.m., the canine, which is trained to alert to the presence of certain drugs and concealed humans, was run inside and outside of the Navigator.  The canine alerted to the rear of the vehicle between the second and third passenger rows. (ECF 52-1 at 24, Ex. H; RT 8/5/16 at 72.)  Arrangements were then made to move the Navigator to the garage where a full search of the vehicle would be conducted.  During this time, Agent Gomez advised Marin that the dog had alerted and asked Marin if it was okay to look inside and search the vehicle.  Marin said that "he was fine with it."  (RT 8/5/16 at 45.)

A search of the vehicle was conducted in the station garage.  Agent Gomez found three five-gallon water bottles on the floor behind the second row of seats.  (*Id*. at 77.) Agent Gomez shook a  bottle and with the aid of a flashlight observed particles therein. Agent Gomez informed Agent Fernandez that the water seemed "murky."  (*Id*. at 81-82.) Agent Fernandez agreed that the water inside was not consistent with that of filtered water from a factory-sealed bottle. (Fernandez Report, ECF 56 at 11.)  Agent Diaz, one of the agents who pulled the jugs out with Gomez, overheard Gomez share his observations about the murky water.  Agent Diaz testified that at first the liquid looked

like water, but that after one shook it, it did not look like water, and one could see particles.  (RT 8/10/16 at 5.)  Agent Diaz did not notice any layering of the liquid at any time and saw "floaties" only after the bottle was shaken.  (*Id*. at 6.)

Agent Fernandez removed one of the bottles, and while doing so, spilled some of the contents onto his head, leading him to wipe his hand on a stainless steel counter.  Agent Fernandez noticed that the water began to dry and crystallize.  (*Id*. at 79-80.)  Agents Fernandez and Gomez conducted a field drug test of water drawn from one of the jugs, and the test produced a positive reading for the presence of methamphetamine.  (*Id*.)  Thereafter, at approximately 7:00 p.m., Pagan placed Marin under arrest.

At approximately 9:00 p.m., Task Force Offices Arnotti, Merklein, and Kempton responded to the San Clemente Checkpoint.  Agent Arnotti processed the evidence and took custody of the bottles from Agent Pagan.  (Ex.6.)  Agent Arnotti contacted HazMat Coordinator Moore to discuss procedures for the testing, handling, and destruction of the contents of the bottles.  (RT 8/10/16 at 20-25.)  DEA policy provided that a chemist would take core samples and that the remainder would be destroyed due to the possibility that the liquid substance may be flammable or caustic.  (*Id*.)

Agent Arnotti transported and stored the bottles overnight at the Carlsbad Field Office ("F.O.") and arranged for DEA forensic chemist Sylvia Brousseau to take samples from the bottles the following day.  (*Id*.)  Ms. Brousseau testified that she arrived at the Carlsbad F.O. on July 8, 2015 at approximately 11:35 a.m. and observed clear liquid in the bottles without layering.  She described layering as a condition created by mixing liquid methamphetamine with oil or gas.  Ms. Brousseau further stated that had there been layering, she would have noticed it when she drew samples from each bottle with a pipette.  She drew 33 mm core samples form each bottle without shaking any of the bottles.  The samples were tested with a field kit test and were presumptive positive for the presence of methamphetamine.  (*Id*. at 29.)

After the core samples were drawn, Agent Arnotti testified that he took the three vials with the core samples and dropped them off in an after-hours dropbox at the DEA

laboratory at approximately 6:02 p.m. on July 8, 2015. (*Id*. at 35.)  Meanwhile, an Evidence Submission Report (Ex. 20) notes that Arnotti submitted the core samples on July 7th at 6:02 p.m.  However, Marin's vehicle did not arrive at the Checkpoint until 6:10 p.m. on July 7, 2015, and the DEA Report of Property Collected Form reports that the core samples were submitted on July 8th.  Based upon these facts and the demeanor of Agent Arnotti, the Court credits Arnotti's testimony that the core samples were submitted on July 8, 2015 at 6:02 p.m.

On July 8th at approximately 11:45 p.m., the HazMat team was dispatched to process the remaining liquid methamphetamine in the three bottles.[2]  At approximately, 12:30 p.m. on July 8, 2015, Brad Long, an Environmental Health Specialist with the County Department of Environmental Health, arrived and poured the contents of the three bottles into a drum containing an absorbent (Ex. 26) which neutralized the liquid. (Long Report, ECF 56, Ex.8; RT 8/10/16 at 31.)  Long took control of the drum for temporary storage at a County facility pending disposal.  (*Id*.)  On July 21, 2015, the waste was taken from the County facility by a registered waste hauler for disposal.  (*Id.*)

## A. THE CHECKPOINT WAS LAWFULLY UTILIZED

Marin argues that the San Clemente Checkpoint was illegally utilized with the specific purpose of stopping and searching the Navigator to advance an ongoing drug trafficking investigation.  The Government denies any improper use of the Checkpoint.

The Fourth Amendment "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).  Accordingly, the Fourth Amendment requires that such seizures be, at a minimum, "reasonable."  *Id.*  Permanent checkpoints, such as those at San Clemente, are maintained at or near important roads leading away from the border

---

[2] Brad Long's report notes that the dispatch occurred at 11:45 p.m. on July 8, 2015 and that the HazMat team arrived on July 8th at 12:30 a.m. with a .75 hour response time.  It is apparent based upon the testimony of the witnesses at the hearing and the information contained in the report that the dispatch occurred on July 8th at 11:45 a.m.

and "operate on a coordinated basis designed to avoid circumvention by smugglers and others who transport the illegal aliens." *United States v. Martinez-Fuerte*, 428 U.S. 543, 552 (1976). A vehicle may be stopped at permanent immigration checkpoints for brief initial questioning and referred to a secondary inspection area for further questioning "in the absence of an individualized suspicion." *Id*. at 562. An officer has wide discretion in making referrals to secondary. *Id*. at 564.

In the instant case, Marin argues that the Checkpoint was opened to stop him, and that the Government has misinformed the Court as to the existence of a prior investigation, tips, and parallel construction that provided the basis for the stop. (ECF 51-1 at 2). However, the evidence demonstrates that the operation times for the operation of the Checkpoint were previously scheduled by the Checkpoint supervisor. The primary inspection officer, Agent Pagan, played no role in setting up the schedule or the decision to open up the Checkpoint. There is no evidence that Agent Pagan was provided with any advance information about Marin. Agent Pagan testified that in seven years at the Checkpoint he had never specifically opened up the Checkpoint to stop a particular vehicle. Moreover, the nature of the questioning of Marin at the primary inspection area was consistent with an immigration inquiry.

The instant case involves facts similar to those presented in *United States v. Barnett*, 935 F.2d 178 (9th Cir. 1991), where the Ninth Circuit found that reasonable suspicion was unnecessary to support a referral to secondary inspection absent objective evidence of the charge of pretext. 935 F.2d at 180-82. In *Barnett*, a Border Patrol Agent at the Temecula checkpoint stopped the car in which Barnett was traveling, asked a few brief questions, and referred the car to the secondary inspection area. *Id*. at 179. At the secondary inspection area, another agent obtained consent to do a canine perimeter search and subsequently obtained consent to do a hand search of the interior of the car. *Id*. Barnett contended that the referral by the first agent to secondary inspection was illegal and without any articulable suspicion, and that the first agent's purpose in referring Barnett and the car's owner to secondary inspection was not for further investigation of

immigration-related offenses, but, rather, for investigation of drug-related offenses.  *Id.* at 181.  The Ninth Circuit rejected this position and observed that while the holding of *Martinez-Fuerte* was limited to immigration-related searches, "that limitation . . . d[id] not mandate an inquiry into the subjective purpose of the agent making referrals to secondary inspection, unless there is some objective evidence supporting the charge of pretext." *Id.* (citing *Horton v. California*, 496 U.S. 128 (1990)).

In *United States v. Koshnevis*, 979 F.2d 691 (9th Cir. 1992), the Ninth Circuit affirmed its holding that "*Martinez-Fuerte* 'does not mandate an inquiry into the subjective purpose of the agent making referrals to secondary inspection, unless there is some objective evidence supporting the charge of pretext.'"  979 F.2d at 694 (citing *Barnett*, 935 F.2d at 181).  "In the absence of affirmative evidence that [the primary inspection agent] harbored a subjective purpose in referring [the defendant] to secondary inspection for drug-related offenses, [the court] will not require an agent to demonstrate articulable suspicion for an otherwise legitimate immigration stop." *Id*.

Here, Marin has failed to provide objective evidence of pretext.  Marin has challenged his stop at the Checkpoint based upon a so-called "parallel construction" theory.  Under this theory, Marin claims that agents had information which led them to either know or guess correctly that there were drugs in the Lincoln Navigator.  To support this theory, he points to the existence of a silent alert on the owner of the Navigator when the car entered the United States; the opening of the Checkpoint soon thereafter; and the fact that Marin was picked out of heavy traffic.  The claim of pretext is belied by the facts developed during these proceedings and common sense.

First, as to the existence of a silent alert on the owner of the Navigator, there is no indication that the silent alert information was forwarded to the San Clemente Checkpoint personnel before Marin arrived at the Checkpoint.  Agent Pagan testified that he did not receive such TECS information, and the radio call traffic logs support his testimony.

Second, as to the timing of the opening of the Checkpoint, the evidence

1  demonstrates that the Checkpoint schedule was predetermined prior to July 7, 2015 and

2  that the Checkpoint was scheduled to remain open from 5:45 p.m. until 6:15 p.m on July

3  7th.  In fact, the Checkpoint was placed in operation at approximately 5:50 p.m. and was

4  brought down at approximately 6:15 p.m.  There is no evidence to support Marin's

5  claim that the Checkpoint was placed into operation as a result of any outside

6  information.

7      Third, Agent Pagan affirmatively testified that he did not receive any advance

8  information about Marin, did not pick out Marin based upon prior information, and did

9  not refer him to secondary based upon such information.

10      Fourth, Agent Pagan conducted an initial inspection consistent with an immigration

11  purpose.  The entire inspection lasted less than a minute and consisted of questions

12  regarding Marin's immigration status, when he had crossed into the United States, and

13  where he was headed.  Each of the questions posed was consistent with an immigration

14  inquiry.  When Marin was referred to secondary, Agent Pagan relayed to officers at

15  secondary that Marin had walked across the border.  Given that Marin was now driving

16  a Lincoln Navigator with California plates, it was reasonable for Pagan to pass on this

17  information to permit further immigration inquiries regarding Marin's immigration status

18  or the possibility of alien smuggling.

19      Lastly, a parallel construction theory makes little sense.  If a drug investigation of

20  the owner or the Navigator was being conducted with the goal of searching the

21  Navigator, the opportunity presented itself at the port of entry when the Navigator

22  entered the United States, where officers could have easily acted upon the silent  alert

23  and any other information.  Releasing the vehicle to follow it to the San Clemente

24  Checkpoint increased the likelihood that the vehicle and its drug load would be lost in

25  rush hour traffic.  Ultimately, there is no objective evidence that a separate drug

26  investigation existed or that the actions of the officers at the Checkpoint were influenced

27  by information derived from that investigation.

28      Based upon the above, the Court concludes that the evidence demonstrates that

1   there was no pretext employed by law enforcement to stop Marin, and that the

2   Checkpoint stop of Marin at the primary inspection area and the referral to secondary

3   were legal.

4   **B. MARIN'S DETENTION WAS NOT PROLONGED**

5   Marin argues that even if the Checkpoint was not being used as a pretext, his

6   detention was prolonged in violation of his Fourth Amendment rights.  (ECF No. 51-1

7   at 15.)  Marin asserts that his detention should have ended at primary because the

8   government had completed its immigration inspection at the primary inspection area.

9   The evidence discloses that Marin was encountered at 6:10 p.m. and referred to

10  the secondary inspection area less than a minute later.  At secondary, an immigration

11  inquiry was made, and within two minutes, Marin provided consent for a canine sniff of

12  the Navigator with a drug and human-detecting canine.  Meanwhile, during this time,

13  immigration inquiries for Marin were simultaneously being conducted.

14  The Supreme Court has held that in the context of a traffic stop, a stop exceeding

15  the time needed to handle the matter for which the stop was made violates the

16  Constitution's shield against unreasonable seizures.  *Rodriguez v. United States*, 135 S.

17  Ct. 1609, 1612 (2015).  Marin cites *Martinez-Fuerte* for the proposition that officers are

18  allowed to ask only "a brief question or two and possibly the production of a document

19  evidencing a right to be in the United States."  428 U.S. at 558 (internal citation and

20  quotation marks omitted).  In fact, there was brief questioning regarding Marin's

21  immigration status by Agent Pagan that lasted less than a minute.  During this time,

22  Agent Pagan learned that Marin was the holder of a B1/B2 visa and that he had entered

23  the United States through the pedestrian lanes before obtaining the Navigator and

24  proceeding to San Clemente.  A driver may be referred to secondary inspection "for the

25  sole purpose of conducting a routine and limited inquiry into residence status that cannot

26  feasibly be made of every motorist where the traffic is heavy."  *Id.* at 560.  Photographs

27  of the primary checkpoint show that traffic was heavy at the time that Marin arrived.

28  Agent Pagan also testified that he does not review immigration documents at primary in

order to accommodate traffic and reduce the amount of time that drivers are impacted.

To the extent that Agent Pagan had time to conclude his immigration inspection at primary, the Government argues that the further brief detention was supported by a "minimal showing of suspicion." *See United States v. Taylor*, 934 F.2d 218, 221 (9th Cir. 1991). In *Taylor*, the Ninth Circuit ruled that, where the immigration purposes of a checkpoint stop have been served, a "brief further detention conducted by the government in this case must be predicated on an articulable suspicion or 'a minimal showing of suspicion.'" *Id.* (internal citation omitted); *c.f. United States v. Des Jardins*, 747 F.2d 499, 505-06 (9th Cir. 1984) (upholding a pat-down search of a person at the border based on only a minimal showing of suspicion).

As found above, there was no pretextual use of the primary inspection to further anything other than an immigration inspection. As such, the referral of Marin to secondary was justified and did not require an articulable suspicion. While there was no justification required, information developed during the brief encounter between Agent Pagan and Marin presented a minimal showing of suspicion to justify a referral to secondary for a further inquiry. Agent Pagan determined at primary that Marin, the holder of a B1/B2 visa, had entered the United States walking through the pedestrian lanes at the port of entry before taking control of a Lincoln Navigator with California plates. In referring Marin to secondary inspection, Agent Pagan passed on the information to the secondary agents for follow-up. To the extent that it was necessary, the information provided a minimal showing of suspicion to justify a referral to secondary for further inquiry.

After Marin arrived at secondary inspection, Agent Gomez followed up and asked Marin where he was coming from, where he was going, and whether or not he had anything in the vehicle, at which time Marin became nervous. In response to Marin's answers and nervousness, Agent Gomez asked Marin for consent to perform a canine search. Consent was given. Marin then exited the Navigator and was escorted to a bench. Given the information radioed to Agent Gomez, Marin's answers to Gomez's

1    questions, and Marin's reported nervousness, the Court finds that the two minutes of

2    questioning by Agent Gomez preceding Marin's consent to a canine sniff were

3    reasonable.

4          Marin also challenges the period of time that he was detained following the

5    consent for a canine sniff.  This issue is addressed following consideration of the consent

6    issue.

7                    **C.  MARIN CONSENTED TO THE CANINE SNIFF**

8          Marin next challenges the canine sniff of his vehicle on the grounds that it was a

9    warrantless search without consent.  In his declaration, Marin asserts that once he arrived

10   in secondary, he was almost immediately surrounded by four agents and told that the

11   agents were going to do a routine inspection.  (ECF No. 52-1, Ex. G at ¶¶ 7-8.)  He

12   further claims that no one asked for permission to search the Navigator.  (*Id.* at ¶ 9.)

13   Marin also states that he knew he was detained and believed that the agents would

14   continue searching the Navigator no matter what Marin said.  (*Id.* at ¶ 15.)

15         The video at secondary shows Agent Gomez, in uniform with a firearm at his side,

16   approaching Marin at the passenger side of the Navigator.  Meanwhile, three other

17   agents in uniform can be observed standing on the other side of the vehicle.  Agent

18   Gomez testified that he asked Marin questions regarding where he was going and his

19   immigration status prior to asking for consent for a canine sniff.  After obtaining consent,

20   Marin was escorted to a bench.  Video of this contact between Agent Gomez and Marin

21   shows that it lasted less than two minutes.  In addition, Agent Gomez also observed

22   Agent Fernandez ask for and receive permission from Marin to run the canine on the

23   outside and inside of the vehicle.

24         To the extent that Marin denies that he was asked for consent or gave it, the Court

25   credits Agent Gomez's testimony as credible as to the sequence of events at secondary,

26   including the request for consent to conduct a canine search.  This conclusion is further

27   borne out by the video at secondary, the report of Agent Fernandez,  and the testimony

28   of Agent Gomez, who testified that Agent Fernandez also asked Marin for consent for

1    the canine sniff and that it was provided a second time before the canine sniff was

2    performed. (RT 8/5/16 at 57, 62; ECF 52-1 at 24, Ex. H .)

3         A warrantless search is unconstitutional unless the government demonstrates that

4    it "fall[s] within certain established and well-defined exceptions to the warrant clause."

5    *United States v. Murphy*, 516 F.3d 1117, 1120 (9th Cir. 2008) (quoting *United States*

6    *v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988)).  Consent constitutes one

7    such exception: "[A warrantless] search conducted pursuant to a valid consent is

8    constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

9    The government bears the burden of proving that consent was voluntary.  *United States*

10   *v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2003).  Whether consent to search was

11   voluntarily given is "to be determined from the totality of all the circumstances."

12   *Schneckloth*, 412 U.S. at 227. A court considers five factors in determining

13   voluntariness: "(1) whether defendant was in custody; (2) whether the arresting officers

14   had their guns drawn; (3) whether Miranda warnings were given; (4) whether the

15   defendant was notified that he had a right not to consent; and (5) whether the defendant

16   had been told a search warrant could be obtained." *United States v. Jones*, 286 F.3d

17   1146, 1152 (9th Cir. 2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th

18   Cir. 1989) (distilling from case law the five factors now widely used).  No one factor is

19   determinative in the equation.  *Id.*; *United States v. Morning*, 64 F.3d 531, 533 (9th Cir.

20   1995) ("[A]lthough we have established these factors to aid in the decision making

21   process, the full richness of every encounter must be considered . . . . Every encounter

22   has its own facts and its own dynamics.  So does every consent.").

23        In support of his argument, Defendant Marin relies on *United States v. Perez*, 506

24   Fed.App'x. 672 (9th Cir. 2013), and asserts that it is virtually indistinguishable from this

25   case.  In *Perez*,  following a traffic stop, defendant Garcia, the driver of the vehicle, was

26   confronted by police officers who ordered him out of the car, frisked him, seated him and

27   forbade him from rising.  506 Fed. App'x. at 674.  Garcia was told, "You can't stand up

28   because we['re ordering you to sit down." *Id.*  In addition, Garcia testified that when

1    he was asked to step out of the vehicle, he saw "guns drawn by uniform[ed] police

2    officers." *Id.*  Garcia was also denied his right to call his lawyer, despite his repeatedly

3    asking to do so.  *Id.*  Under these facts, the court found that Garcia's consent to search

4    the vehicle was involuntary.  *Id.*

5           Here, at the time that Marin provided consent, (1) he was not free to leave; (2)

6    officers at secondary inspection did not have their guns drawn; (3) Miranda warnings

7    were not given because Marin had not been placed under arrest; (4) Marin had not been

8    advised that he had the right to refuse consent; and (5) Marin was not told that a search

9    warrant could be obtained.  *See United States v. Curtis*, 568 F.2d 643, 646 (9th Cir.

10   1978) ("If the person reasonably believes that he cannot leave freely, he is considered

11   in custody[.]") (quoting *United States v. Luther*, 521 F.2d 408, 410 (9th Cir. 1975)).

12          Specific to this case, there is nothing to suggest that Agent Gomez exerted any

13   overt coercion on Marin to consent.  Nor was the situation inherently coercive: Marin

14   was not under arrest, and the agents did not have their guns drawn.  Marin was at

15   secondary next to a public highway, a setting held to actually discourage coercion.  *See*

16   *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984) (exposure to public view both reduces

17   the ability of an unscrupulous policeman to use illegitimate means and diminishes the

18   motorist's fear that, if he does not cooperate, he will be subjected to abuse).  While Agent

19   Gomez did not give a Miranda warning, it was not required, since Marin was not under

20   arrest at the time.  *See Schneckloth*, 412 U.S. at 231-32 (consent searches are part of the

21   standard investigatory techniques of law enforcement agencies, normally occur under

22   informal and unstructured conditions, and do not require *Miranda* warning). Viewing the

23   totality of the circumstances, the Court concludes that Marin's consent given on two

24   separate occasions to two different agents was voluntary and freely given.

25          **D.  THE TIME FOR THE CANINE SEARCH WAS REASONABLE**

26          Marin also objects to the length of time that he was detained in order for a canine

27   search to be performed.

28          In this case, Marin was referred to secondary at 6:11 p.m. and gave consent for

a canine sniff at 6:13 p.m.  The canine sniff was completed and resulted in an canine alert at the back of the Navigator by 6:20 p.m.  Afterwards, Marin was notified of the canine alert and was asked if it was okay if the agents looked inside and searched the vehicle. Defendant said that "he was fine with it."  (RT 8/5/16 at 20-21.)  The record does not indicate that Marin objected at any time to the use of a narcotics dog, the length of the time necessary to perform the canine sniff, or the scope of the search.  "Failure to object to the continuation of a vehicle search after giving general consent to search 'is properly considered as an indication that the search was within the scope of the initial consent.'" *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994) (quoting *United States v. Sierra-Hernandez*, 581 F.2d 760, 764 (9th Cir. 1978)).

Here, the canine search took seven minutes to complete after consent was given, and Marin never objected to the scope or length of the canine sniff.  In view of these facts, the Court finds that the length of time to complete the canine sniff was reasonable.

**E.  THE CANINE ALERT LED TO PROBABLE CAUSE TO SEARCH**

Marin also challenges the search of the Navigator, arguing that the search was not supported by probable cause.  The Government opposes.

An alert by a certified, reliable narcotics detector dog, with nothing more, is sufficient to establish probable cause to search and arrest.  *Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013); *United States v. Cedano-Arellano*, 332 F.3d 568, 573 (9th Cir. 2003).

In this case, the canine sniff by a reliable drug and human detector dog produced an alert for the presence of humans or drugs at 6:20 p.m.  Following the alert, a full search of the Navigator was conducted, and the liquid methamphetamine was discovered at approximately 7:00 p.m.  The alert alone provided law enforcement officers probable cause to search the entire Lincoln Navigator.  As such, the Court **DENIES** Marin's motion to suppress evidence based upon the lack of probable cause to search.

**F.  ANY DESTRUCTION OF EVIDENCE DID NOT CONSTITUTE A**

1    **DUE PROCESS VIOLATION**

2         Marin claims that the Government destroyed evidence on July 20, 2015 after he

3    asked the Government to preserve all of the physical evidence in the case.  (Ex. S.)  The

4    Government responds that the remaining liquid substance containing methamphetamine

5    was neutralized on July 8, 2015 before the letter requesting preservation was delivered,

6    and that the destruction of the neutralized hazardous materials on July 21, 2015 could not

7    have denied Marin any materially exculpatory evidence.

8         In *California v. Trombetta*, 467 U.S. 479 (1984), the Court held that the

9    government violates the defendant's right to due process (1) if the unavailable evidence

10   possessed "exculpatory value that was apparent before the evidence was destroyed, and

11   (2) [is] of such a nature that the defendant would be unable to obtain comparable

12   evidence by other reasonably available means."  467 U.S. at 489.

13        In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Court added the  requirement

14   that the defendant must demonstrate that the police acted in bad faith in failing to

15   preserve the potentially useful evidence.  488 U.S. at 58.  *Youngblood*'s bad faith

16   requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value

17   of the evidence be apparent before its destruction.  *Trombetta,* 467 U.S. at 489.  The

18   presence or absence of bad faith turns on the government's knowledge of the apparent

19   exculpatory value of the evidence at the time it was lost or destroyed.  *Youngblood*, 488

20   U.S. at 56-57; *c.f. Napue v. Illinois*, 360 U.S. 264, 269 (1959).  In evaluating whether

21   the evidentiary value of the evidence was apparent, courts often consider notice to the

22   government based on statements made by the defendant or requests to preserve.

23   *Zaragoza-Moreira*, 780 F.3d at 979; *Cooper*, 983 F.2d at 932.

24        **Exculpatory Value Was Not Apparent before the Evidence Was Destroyed**

25        In *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), the Ninth Circuit

26   affirmed the dismissal of an indictment based upon the destruction of laboratory

27   equipment in a prosecution for manufacture of methamphetamine.  983 F.2d at 931.

28   Defendants, who were doing business as Apotheosis Research, were charged with

conspiring to manufacture methamphetamine in a laboratory that was configured to produce a legal substance called dextran sulfate. *Id.* at 929. Following seizure of the laboratory equipment, defense counsel contacted the case agent and requested the preservation of the laboratory equipment in order to support the defense that the laboratory was configured to manufacture legal products and not methamphetamine. *Id.* at 930. The district court found that the "equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents." *Id.* at 931. In fact, "[d]uring the pre-seizure investigation, Cooper's parole officer and the lab's landlord reported Apotheosis Research's claims of legitimacy." *Id.* "Agents involved in the search knew that the lab was ostensibly configured to make dextran sulfate." *Id.* "In conversations following the seizure, agents repeatedly confronted claims that the equipment was specially configured for legitimate chemical processes and was structurally incapable of methamphetamine manufacture." *Id.* In response to defense requests for return of the equipment, government agents repeatedly stated that they held it as evidence even after the equipment had been destroyed. *Id.* Based upon these facts, the Ninth Circuit agreed that the "equipment's exculpatory value was apparent to government agents before they, in bad faith, allowed its destruction." *Id.*

In this case, the three bottles of liquid methamphetamine were seized on the evening of July 7, 2015. (Ex. J.) The chemist testified that on July 8th, she took her samples from the bottom of the bottles because she did not notice any layering which would require taking samples from the top, the middle, and the bottom of the bottles. As to the presence of "floaties," they were not noticed by the chemist. Instead, they were observed at the time of the initial search by Agents Gomez and Diaz after shaking up a bottle and shining a flashlight into the bottle.

The testimony of defense investigators further supports the DEA chemist's observations as to the lack of layering and the absence of "floaties" prior to shaking the liquid. On May 11, 2016, Defense investigators traveled to the DEA laboratory in Vista in order to examine the vials containing the core samples of the liquid methamphetamine.

1    (Ex. WW.)  The liquid methamphetamine was described, at first glance, as being clear

2    like water.  (*Id*.)  Federal Defender Investigator Veronica Saltiel testified that before she

3    shook the vials, the liquid looked like water.  After shining a light behind each vial, shiny

4    particles were observed floating in the liquid.  (*Id*.)  When the vials were not exposed to

5    light, the particles did not shine.  (*Id*.)  Investigator Saltiel testified that no request for

6    retesting the liquid methamphetamine was made.

7        In that no one noticed any layering in the bottles, there was no reason for the

8    chemist to draw and test any identifiable layers.  Also, in that the "floaties" were only

9    visible after shaking the bottle and with the use of a flashlight, there was nothing about

10   the appearance of the liquid methamphetamine that made it apparent to the chemist that

11   any other procedures were needed in order to obtain necessary samples of the liquid

12   methamphetamine.

13       Marin also argues that the Government was placed on notice of the exculpatory

14   value of the liquid methamphetamine and bottles based on a July 20, 2015 letter to the

15   Government seeking preservation of evidence.  However, as of July 20, 2015, the liquid

16   methamphetamine, having been neutralized, no longer existed.   In addition, the

17   neutralized liquid methamphetamine was no longer in the possession of the United States.

18   The evidence shows that on the afternoon of July 8, 2015, according to custom and

19   practice, the liquid methamphetamine was poured into a drum containing foam which

20   neutralized the drug but produced a hazardous waste.  The hazardous waste was then

21   taken by the County of San Diego HazMat team.  On July 21, 2015, the County arranged

22   for the hazardous waste to be picked up by a registered hazardous waste hauler for

23   disposal.  (Exs. O, T.)

24       Finally, not only did the Government no longer control or possess the neutralized

25   liquid methamphetamine as of the July 20th request, but the liquid methamphetamine had

26   been neutralized as of July 8th, rendering it a waste product that was altered from its

27   original form.  The hazardous waste lacked any exculpatory value.

28       **Defendant's Ability to Obtain Comparable Evidence**

Defendant argues that destruction of the hazardous waste has made it impossible to obtain comparable evidence to that which was destroyed. This argument requires the Court to analyze the purpose and value of the hazardous waste at the time that it was sought.

In order to convict Marin of the drug offense charged, the Government is required to prove that he knowingly possessed the liquid methamphetamine. Because Marin was not the owner of the vehicle, had not seen the bottles behind the second row, and did not confess, the defense asserts that the only way to circumstantially establish the element of knowledge is by offering evidence of the value of the drugs. The Government rejects this notion and points to Marin's story as to the purpose of his trip, his nervousness when he was asked if the contents of the vehicle belonged to him, and the timing of Marin walking into the United States ahead of the Navigator at the same port of entry.

Marin also focuses on the inability to test the drugs so as to be able to rebut a Government argument regarding the quantity and value of the drugs. Marin asserts that the quantity and value of the purported methamphetamine cannot be determined due to inconsistent representations about the appearance of the liquids, problems with the sampling technique, and defects in the chain of custody. (ECF 51-1 at 24.) However, if Government witnesses testify about the value of the drugs, Marin can cross-examine the Government's witnesses as to the alleged deficiencies in the manner in which liquid methamphetamine was drawn from the bottles.

Next, Marin alleges that the destroyed evidence was critical because it would have revealed that Marin's fingerprints were not on the bottles. Marin asserts that the fact that the bottles were destroyed denies him the ability to test the bottles for fingerprints and make the argument that Marin had not handled the bottles. While Marin may be unable to check the destroyed bottles for fingerprints or DNA, Marin can certainly establish that the Government itself did not check the bottle for fingerprints or DNA.

Ultimately, the fact that the liquid methamphetamine was neutralized and thereafter destroyed does not harm Defendant. Instead, it allows the defense to pick

apart the Government's investigation and handling of the liquid methamphetamine.  It does not deny Marin any evidence which is exculpatory.  Instead, at most, Marin is denied the ability to affirmatively offer proof regarding the absence of his DNA and fingerprints on the bottle.   Marin is left with the corollary argument that the Government's  failure to lift prints or DNA demonstrates an inadequate investigation.

**Bad Faith**

Marin cannot demonstrate bad faith as to the destruction of the neutralized liquid methamphetamine.  First, unlike in *Cooper*, there was not a specific request to retain the neutralized methamphetamine or the bottles.  The general request to preserve physical evidence did not specifically ask the Government to preserve the neutralized methamphetamine and bottles.  Nor did the request plainly alert the Government that Marin was seeking the preservation of hazardous materials that the DEA no longer controlled and were in the possession of the County of San Diego.

**Conclusion**

The neutralized methamphetamine and the bottles were not materially exculpatory.  Given that the drugs were neutralized on July 8, 2015, it does appear that the liquid waste was capable of being retested by anyone.  In addition, neither the liquid waste or the bottles operate to disprove any element of the charges.  Assuming that the waste and the bottles were materially exculpatory, the exculpatory value was not apparent to the Government at the time that the liquid waste and bottles were transferred to the custody of the County of San Diego.  At most, the neutralization of the liquid methamphetamine affects the amount of available evidence as to the readily provable amount of drugs.  To the extent that there were deficiencies in testing procedures, Marin can raise them at trial and, if he is found guilty, at a sentencing hearing.

For the reasoning set out above, the Court **DENIES** the motion to dismiss indictment.

## G.  SUPPRESSION BASED UPON DESTRUCTION OF EVIDENCE

In the alternative, Marin seeks the suppression of the vials of liquid

methamphetamine preserved and analyzed based on the quality of the Government's conduct and the severe prejudice to Marin.

If the government destroys evidence under circumstances that do not violate a defendant's constitutional rights, the court may still impose sanctions including suppression of secondary evidence. *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring), *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008). In so doing, the court must balance "the quality of the Government's conduct and the degree of prejudice to the accused." *Id*. "The Government bears the burden of justifying its conduct and the defendant bears the burden of demonstrating prejudice." *Id*. In weighing the conduct of the Government, the court should inquire whether the evidence was lost or destroyed while in its custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification. *Id.*

As discussed above, the liquid waste and bottles were no longer in the Government's custody when they were destroyed; the Government was not on notice that the evidence had exculpatory value; and the alleged acts were not deliberate. As to reasonable standards of care, the protocol used by the DEA to neutralize liquid methamphetamine and transfer the toxic waste to the County of San Diego HazMat team was designed to advance public safety and was not deficient.

Accordingly, the Court finds that the Government has met its burden of proof of justifying its conduct, and that Marin has failed to demonstrate any significant prejudice. The Court **DENIES** Marin's motion to suppress evidence.

## H.  DESTRUCTION DID NOT VIOLATE RULE 16

Additionally, Marin seeks to exclude the evidence under Federal Rule of Criminal Procedure Rule 16, claiming that the Government's action constitutes an intentional violation of Rule 16. Rule 16 applies to an action "[u]pon a defendant's request." In

addition, Rule 16 applies as to an "item [] within the government's possession, custody, or control."

In this case, three core samples of liquid methamphetamine have been tested by the DEA and preserved.  Defense counsel has had the opportunity to test the core samples of liquid methamphetamine.  As to the remaining liquid methamphetamine, the July 20th request was made after the liquid methamphetamine was neutralized.  The liquid hazardous waste was picked up from the DEA by the County of San Diego on July 8th, and the waste was not in the custody, control, or possession of the United States as of the July 20th request for preservation of evidence.  As such, there was no violation of Rule 16.

Assuming that a Rule 16 violation was committed, the Court turns to the available remedies.  Where the government violates Rule 16, the court can: "(A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2). Here, Marin is seeking a remedy that "is just under the circumstances."

The Court is vested with discretion in imposing a sanction for a failure to comply with a discovery rule, and the sanction "should not [be] . . . harsher than necessary to accomplish the goals of Rule 16." *United States v. Gee*, 695 F.2d 1165, 1168-69 (9th Cir. 1983).  Exclusion is an appropriate remedy for a discovery violation where the omission was willful and motivated by a desire to obtain a tactical advantage. *Taylor v. Illinois*, 484 U.S. 400, 415 (1988).

Even if the Court were to find that there was a Rule 16 violation and that the liquid waste was material to preparing a defense, the Court finds that for the reasons stated in the preceding section, the failure to comply with Rule 16 was not willful or done to obtain tactical advantage.

1  As such, suppression of the liquid methamphetamine would not be just, and

2  Marin's motion to suppress evidence under Rule 16 is **DENIED**.

3  **I.  AUTHENTICATION OBJECTIONS CAN BE RAISED AT TRIAL**

4  Finally, Marin moves the Court to exclude the liquid methamphetamine maintained

5  and tested in this case on the grounds that the Government cannot authenticate the

6  evidence.  Marin points to a number of reporting errors that are referenced in the

7  statement of facts section and in his moving papers.  Marin is free to point out all of the

8  instances of misreporting and seemingly contradictory observations at trial.  The Court

9  will defer any authentication issues until trial.

10  **CONCLUSION**

11  For all the reasons stated herein, the Court **DENIES** Defendant Marin's Motion

12  to Dismiss Indictment and all of the Motions to Suppress Evidence on the various

13  grounds asserted.

14

15  Dated:  October 28, 2016

16  Hon. Gonzalo P. Curiel

17  United States District Judge

18

19

20

21

22

23

24

25

26

27

28